*Brenda Moody Whinery*

**Brenda Moody Whinery, Chief Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| DAVID K. CROWE and COLLEEN M. CROWE, | Case No. 4:19-bk-04406-BMW |
| Debtor(s). | **RULING AND ORDER REGARDING PLAN CONFIRMATION** |

Before the Court is the *Amended Chapter 11 Plan of Reorganization Dated August 2, 2019 Proposed by David K. Crowe and Colleen M. Crowe* (DE 129)[1] filed by David K. Crowe ("Mr. Crowe") and Colleen M. Crowe ("Mrs. Crowe," and collectively with Mr. Crowe, the "Crowes" or "Debtors"), as amended and modified by the *Notice of Stipulated Modification to Debtors' Chapter 11 Plan of Reorganization Dated May 13, 2019 (Class 4 – USAA, Toyota Tacoma)* (DE 159), the *Second Non-Adverse Modification to Amended Chapter 11 Plan of Reorganization Dated August 2, 2019 Proposed by David K. Crowe and Colleen M. Crowe* (DE 349) and the *Third Non-Adverse Modification to Amended Chapter 11 Plan of Reorganization Dated August 2, 2019 Proposed by David K. Crowe and Colleen M. Crowe* (DE 395) (collectively, the "Plan"). The Official Committee of Unsecured Creditors (the "Committee") and Committee members Tucson Embedded Systems, Inc. ("TES"), Turbine Powered Technology, LLC ("TPT"), and Lindsay Brew ("Mr. Brew") filed objections to the Plan and joinders thereto,[2] and the Crowes'

---

[1] References to filings on the docket in this bankruptcy case are indicated by "DE__." Reference to exhibits introduced into evidence are indicated by "TE __." However, if an exhibit entered into evidence is also a docket entry, the Court will refer to the document using its docket entry number.

[2] Specifically, the *Objection to Debtors' Amended Plan of Reorganization Dated August 2, 2019* (DE

filed responses to those objections.[3]

On March 16, 2021, the parties filed a *Joint Pretrial Statement* (the "Joint Pretrial Statement") (DE 378), which the parties agree sets forth all the outstanding issues pertaining to confirmation. (*See* 3/31/2021 Hearing Tr. 97:15-98:1).

The Court conducted a contested confirmation hearing on March 30, 2021 and March 31, 2021, at which time the parties presented evidence, and testimony was provided by the Crowes. On April 16, 2021, the Crowes, the Committee, TPT, and TES submitted post-trial briefs, and the Court took this matter under advisement. (DE 414; DE 415; DE 416; DE 417).

Based on the pleadings, arguments of counsel, testimony offered, exhibits entered into evidence, and entire record before the Court, the Court now issues its ruling.

## I. <u>Jurisdiction</u>

This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(L). Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a). The parties agree that the Court has jurisdiction over this proceeding and that venue in this Court is appropriate. (DE 378 at § IV.A).

This is a contested matter governed by Federal Rule of Bankruptcy Procedure 9014. The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to contested matters by Federal Rules of Bankruptcy Procedure 9014(c) and 7052.

---

160) filed by the Committee; the *Joinder in Objection to Debtors' Amended Plan of Reorganization Dated August 2, 2019* (DE 161) filed by TES; the *Objection to Amended Chapter 11 Plan of Reorganization Dated August 2, 2019 Proposed by David K. Crowe and Colleen M. Crowe* (DE 162) filed by TPT; the *Objection to Debtors' Amended Plan of Reorganization Dated August 2, 2019* (DE 164) filed by Mr. Brew; and the *Supplemental Objection to Debtors' Amended Plan of Reorganization Dated August 2, 2019* (DE 285) filed by TES. USAA Federal Savings Bank also filed an objection to confirmation, but that objection is no longer outstanding. (*See* DE 163; DE 329; DE 374).

[3] Specifically, the *Debtors' Response to Objections to Plan from 1) The Official Committee of Unsecured Creditors (DE 160); 2) Turbine Power Technology, LLC (DE 162); and 3) USAA (DE 163)* (DE 177), as corrected by the *Notice of Errata to Debtors' Response to Objections to Plan from 1) The Official Committee of Unsecured Creditors (DE 160); 2) Turbine Power Technology, LLC (DE 162); and 3) USAA (DE 163)* (DE 196); and the *Debtors' Response to TES's Supplemental Objection to Debtors' Amended Plan of Reorganization Dated August 2, 2019* (DE 303).

## II.    Factual and Procedural Background

On April 12, 2019 (the "Petition Date"), the Crowes filed their voluntary petition for relief under chapter 11 of the Bankruptcy Code, thus commencing this case. (DE 1). Mr. Crowe testified that this case was filed due to an injunction that was impeding his ability to gain employment and/or customers, and due to the costs of ongoing litigation with various third parties, including TPT. (3/30/2021 Hearing Tr. 25:20-26:6, 26:12-20).

### A.    Assets

The Crowes scheduled assets worth in excess of $1.2 million, which assets include their residence in Tucson (the "Residence"); three vehicles; a boat; a Hyster Lift Truck Model H80XM (the "Hyster"); tools, equipment, and furniture (collectively, the "Tools"); savings and checking accounts; a 100% interest in Vida Gasline LLC ("Vida"); a 100% interest in Arizona Turbine Technology, Inc. ("Arizona Turbine"); a 100% interest in CE-Systems, Inc. ("CE-Systems"); retirement accounts; various other personal property; and various claims against TES, Mr. Brew, TPT, and TPT's principal. (DE 83). The Crowes claimed various exemptions, to which no party timely objected. (*See* DE 25 at 10-11). The parties agree that, among other assets, the 100% interests in Vida, Arizona Turbine, and CE-Systems are non-exempt assets of the estate. (DE 378 at § II.H).

#### 1.    *Vida*

Vida's assets consist of cash and real estate. (DE 134 at 21). According to the most recent balance sheet on file, as of February 28, 2021, Vida had $9,154.49 in cash, land valued at $25,000, and no liabilities. (DE 367 at 26).

#### 2.    *Arizona Turbine*

Arizona Turbine is a debtor in a chapter 7 bankruptcy case pending before this Court.[4] The Debtors' scheduled their 100% interest in Arizona Turbine as having an unknown value. (DE 83 at 5). The chapter 7 trustee has designated the Arizona Turbine bankruptcy case an asset case. However, according to the schedules, of which this Court may take judicial notice, Arizona Turbine's liabilities exceed the value of its assets by more than $1.5 million.

---

[4] See *In re Arizona Turbine Technology, Inc.*, No. 4:19-bk-15914-BMW (Bankr. D. Ariz. 2019).

### 3. *CE-Systems*

Prior to the Petition Date, around the time of the formation of EnerTech, CE-Systems transferred certain assets, specifically technology, to EnerTech in exchange for a 40% membership interest in EnerTech. (DE 378 at § II.I; 3/30/2021 Hearing Tr. 66:15-23). During the pendency of this case, CE-Systems transferred 3% of its 40% membership interest in EnerTech to Steve Harter ("Mr. Harter"), an investor in EnerTech, to induce Mr. Harter to provide additional capital to EnerTech and to renew and extend other related loans to EnerTech. (3/30/2021 Hearing Tr. 70:11-71:14; TE 310). Thus, as of the time of the confirmation hearing, CE-Systems held a 37% membership interest in EnerTech. CE-Systems' other assets are cash and provisional patents. (DE 367 at 5).

### B. Liabilities

During the pendency of this case, certain secured debt has been paid or forgiven. The secured claims remaining to be paid in this case, none of which are disputed, contingent, or unliquidated, total less than $180,000. (*See* DE 1 at 29-31; Proof of Claim 4-1; Proof of Claim 9-1; DE 159; DE 329). The secured claims consist of a mortgage on the Residence, debt secured by a 2016 Toyota Tacoma, debt secured by the Hyster, and debt secured by the Tools.

The priority unsecured debt asserted in this case totals $4,484.30. (Proof of Claim 1-3; Proof of Claim 5-1).[5]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[5] It appears the Debtors may have overlooked the priority portion of the proof of claim filed by Tim Kinney. (*See* Proof of Claim 5-1). The other priority unsecured claim in this case is the claim of the Arizona Department of Revenue. (*See* Proof of Claim 1-3).

The filed and scheduled non-insider general unsecured claims[6] that are deemed allowed[7] at this time are:

| Claim[8] | Creditor | Amount of Claim |
|---|---|---|
| Sched. 4.4 | Chase Card | $23,738 |
| Sched. 4.5 | Gust Rosenfeld | $3,462.75[9] |
| Sched. 4.9 | Nordstrom / TD Bank | $404 |
| Sched. 4.13 | Visa (acct 7856) | $15,266.77 |
| Sched. 4.14 | Visa (acct 0924) | $22,320.25 |
| Sched. 4.15 | Visa (acct 1758) | $49.19 |
| POC 3-1 | Wells Fargo (acct 0025) | $3,438.12 |
| POC 5-1 | Tim Kinney | $85,114.77 |
| POC 6-1[10] | Synchrony Bank (acct 7280) | $374.13 |
| POC 7-1[11] | Quantum3 Group (JCrew acct 4554) | $600.94 |
| POC 8-1 | Lindsay Brew | $74,199.37 |
| | | **Total: $225,505.54 to $228,968.29** |

In addition to the foregoing, TES has filed a general unsecured proof of claim in the estimated amount of $320,000, and TPT has filed a proof of claim in an amount of not less than $30,014,536.82, to which proofs of claim the Crowes have objected. (Proof of Claim 11-1; Proof of Claim 12-1; DE 176; DE 178). TES and TPT were engaged in litigation against the Debtors pre-petition, which litigation was stayed on the Petition Date. The Court has granted TES and

---

[6] The Court's tabulation does not include any deficiency claims that may exist or the unsecured insider claim(s) of Arizona Turbine. (*See, e.g.,* DE 159; DE 26; Proof of Claim 13-1).

[7] These claims are deemed allowed given that they were either scheduled as undisputed, noncontingent, and liquidated, or a proof of claim is on file to which no party has objected. *See* 11 U.S.C. § 502(a); 11 U.S.C. § 1111(a); *In re Dynamic Brokers, Inc.,* 293 B.R. 489, 495-96 (B.A.P. 9th Cir. 2003).

[8] References to "Sched." claims are references to the undisputed, noncontingent, liquidated claims in the Debtors' most recently amended schedules. (DE 26). References to "POC" are references to the proofs of claim to which no objection has been filed.

[9] This claim may have been paid in full or in part consistent with the *Stipulated Order Granting in Part Motion for Stay Relief Re: Arbitration Retainer* (DE 98). (*See also* DE 134 at Ex. 3).

[10] This proof of claim supersedes the claim scheduled as claim 4.16. Fed. R. Bankr. P. 3003(c)(4).

[11] This proof of claim supersedes the claim scheduled as claim 4.6. Fed. R. Bankr. P. 3003(c)(4).

TPT stay relief to liquidate their claims in the forums in which the litigation between the parties was proceeding pre-petition.[12] (DE 345; DE 358). However, neither claim had been liquidated as of the time of the contested confirmation hearing, and to the Court's knowledge, neither claim has been liquidated as of the date of the issuance of this decision.

No party has asked this Court to estimate any claims for purposes of confirmation.

**C.   Income and Expenses**

Mr. Crowe receives a salary as the CEO of EnerTech and generates income from consulting work. (*See* 3/30/2021 Hearing Tr. 24:15, 30:2-10, 83:12-23; TE 52; TE 53; TE 54; TE 55; TE 56; TE 57; TE 58; TE 59; TE 60; TE 61; TE 62; TE 63). The monthly operating reports reflect that during the pendency of this case, Mr. Crowe has generated average gross monthly income in the approximate amount of $17,500 per month. (*See* DE 82; DE 117; DE 135; DE 147; DE 172; DE 199; DE 213; DE 216; DE 235; DE 237; DE 252; DE 255;[13] DE 260; DE 261; DE 262; DE 268; DE 273; DE 299; DE 312; DE 340; DE 353; DE 375; DE 420; DE 429).

As of the Petition Date, Mrs. Crowe was unemployed. (*See* DE 1 at 43-44). For approximately four months during the pendency of this case, Mrs. Crowe was employed in retail. (3/31/2021 Hearing Tr. 31:25-32:2; *see* DE 261; DE 262; DE 268; DE 273; DE 299). Mrs. Crowe testified that she does not intend to work during the term of the Plan. (3/31/2021 Hearing Tr. 32:3-5).

During the pendency of this case, the monthly operating reports reflect that the Crowes' disbursements, including payroll deductions and ongoing expenses, have averaged approximately $13,000 per month. (*See* DE 82; DE 117; DE 135; DE 147; DE 172; DE 199; DE 213; DE 216; DE 235; DE 237; DE 252; DE 255; DE 260; DE 261; DE 262; DE 268; DE 273; DE 299; DE 312; DE 340; DE 353; DE 375; DE 420; DE 429).

/ / /

/ / /

---

[12] The Court notes that the Debtors have filed a motion in which they ask the Court to alter or amend the order granting TPT stay relief. (DE 373). That motion remains pending before the Court.

[13] Although this is captioned a monthly operating report for May 2020, the disbursement details and attached statements reflect that this report was miscaptioned, and is actually the Debtors' monthly operating report for April 2020.

### III. The Plan and Ballot Report

#### A. The Plan

The Plan proposes to classify and treat the remaining claims in this case as follows:

*Class 1 – Administrative Claims*

Administrative expense claims allowed under § 503(b), fees payable to the Clerk of the Bankruptcy Court, and fees payable to the Office of the United States Trustee would be subject to a cap in the amount of $350,000, with up to $250,000 of this amount to be paid on the Effective Date,[14] and up to $100,000 to be paid in quarterly payments over the term of the Plan. (DE 349 at § II.A). To the extent allowed administrative claims exceed this cap, creditors have or would agree to accept pro rata payments. (DE 349 at § II.A).

*Classes 2 through 6 – Secured Claims of Quicken Loans, USAA, Jeremy Nicolaides, Kenneth Braccio, Michael Sherwood, and Elden Crom*

The Debtors propose to pay secured claims in full, with interest, over time. (DE 129 at § IV.B.1; DE 159).

*Class 7 – Priority Tax Claims*

The only priority tax claim is the priority claim filed by the Arizona Department of Revenue in the amount of $100. (Proof of Claim 1-3). The Debtors propose to repay this claim in full with interest at a rate of 5% per annum from the Effective Date through 60 equal monthly payments beginning in the first full month following the Effective Date. (DE 129 at § IV.B.2).[15]

*Class 8 – General Unsecured Claims*

Allowed general unsecured claims would be paid pro rata from contributions made by the Debtors over a period of up to five years through an Effective Date payment of approximately $135,000, proceeds from the liquidation of the real property held by Vida, and quarterly payments. (DE 395 at § II & Ex. 1). The Debtors anticipate that allowed general unsecured creditors would receive approximately $222,341.61 under the Plan. (DE 395 at § II). In addition,

---

[14] The Effective Date is defined as "thirty (30) days after an order confirming the . . . Plan becomes final." (DE 129 at § I).

[15] As noted above, the Debtors have not included treatment for the priority claim asserted by Tim Kinney, to the extent allowed. (*See* Proof of Claim 5-1).

general unsecured claims would be paid 25% of any gross proceeds recovered from the claims against TPT, TES, and Mr. Brew, to the extent such litigation is pursued by the Crowes post-confirmation. (DE 395 at § II). There is nothing in the record to indicate whether the Crowes intend to pursue such litigation post-confirmation. If the Debtors were to make a greater payment to Class 8 creditors in any given quarter, such overpayment would be credited against the last payments due under the Plan. (DE 395 at § II). If all allowed general unsecured claims were to be paid in full before plan payments had been completed, payments would continue as if such claims accrued interest at a rate of 4% per annum from the Effective Date. (DE 395 at § II).

To the extent any general unsecured claims are not allowed when payments begin, the Plan provides that the Debtors would ask the Court to estimate those claims and the related pro rata distribution for such claims would be held in a trust account until such claims are allowed, in which case the distributions set aside for such claims would be remitted to the holders thereof, or disallowed, in which case the distributions set aside for such claims would be distributed pro rata to the allowed general unsecured claim holders. (DE 395 at § II).

**B.    Plan Funding**

The Crowes propose to fund the Plan by the following:

1.    Mr. Crowe's post-petition wages to pay claims in Classes 2, 4, 5, and 6, in the amount of $2,144.39 per month;

2.    Net cash from liquidating non-exempt stock and brokerage accounts, after deducting 20% to pay estimated capital gains taxes, which amount is anticipated to total approximately $39,606.50;

3.    Net cash from liquidating the real property owned by Vida, which amount is estimated to total $25,000;

4.    Cash from the Debtors' accounts, after reserving $25,000 for future business operations, which amount is expected to total $120,500;

5.    Cash from Vida in the amount of $5,000;

6.    Cash from CE-Systems in the amount of $45,000;

7.  $100,000 of cash contributed by the Debtors raised from encumbering or liquidating otherwise exempt assets, all of which is new value from the Debtors, and would be made available to make Effective Date payments;

8.  $75,000 of cash contributed by the Debtors on the Effective Date either: (a) raised from a junior lien against their Residence; or (b) if a junior lien against the Residence cannot be obtained, from the liquidation of additional exempt assets, specifically retirement accounts, in which case these funds would be contributed as additional new value; and

9.  A portion of the Debtors' disposable income from the 60 months following the Effective Date in the amount of $162,392.00, or until all claims are paid in full, whichever comes first.

(DE 395 at § III; 3/30/2021 Hearing Tr. 85:5-10, 146:4-25).

**C.  The Votes**

The parties agree that acceptance of the Plan was solicited in compliance with the requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. (DE 378 at § IV.F). Copies of the Plan, the Amended Disclosure Statement, the *Order Setting and Notice of: 1. Approval of the Disclosure Statement; 2. Setting Confirmation Hearing; and 3. Fixing Deadlines to i) Object to Plan, and ii) Vote on Plan* (DE 140), and a form of ballot were mailed to all creditors on the master mailing list on August 27, 2019. (DE 378 at § IV.F).

Class 4, Class 6, and Class 7 voted to accept the Plan.[16] (DE 166). Class 8, the general unsecured class, voted to reject the Plan. (DE 166). Classes 1 and 2 were not entitled to vote, and no votes were received from Class 5.[17] (DE 166). Based upon the foregoing, the parties agree that there is at least one class of claims that is impaired under the Plan that has accepted the Plan. (DE 378 at § IV.G). The Debtors also acknowledge that there is an impaired class of claims that has voted to reject the Plan. (*See* DE 166).

---

[16] Class 3 also voted to accept the Plan. However, the holder of the only Class 3 claim subsequently filed a notice of satisfaction, and the Court has entered an order deeming the claim satisfied. (DE 329; DE 374).

[17] The Court notes that the Class 5 claim, which is a secured claim held by Jeremy Nicolaides, would be paid in full, with interest, under the Plan.

## IV. Legal Analysis & Conclusions of Law

The requirements for confirmation of a chapter 11 plan are set forth in § 1129 of the Code.[18] If all the provisions of § 1129(a) are satisfied with the exception of § 1129(a)(8), a plan may nevertheless be confirmed if it satisfies § 1129(b). The plan proponent bears the burden of establishing, by a preponderance of the evidence, that the plan satisfies the confirmation requirements. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997).

During the contested confirmation hearing, the Debtors testified as to their belief that the Plan satisfies the applicable provisions of § 1129. (3/31/2021 Hearing Tr. 6:23-11:21). The Committee, TES, TPT, and Mr. Brew object to confirmation on the basis that: (1) the Plan fails to comply with § 1129(a)(1) because it improperly classifies dissimilar claims together in violation of § 1122(a); (2) the Plan may not have been proposed in good faith and not by any means forbidden by law, as required by § 1129(a)(3); (3) the Plan fails to satisfy the best interests of creditors test in § 1129(a)(7); (4) the Plan fails to satisfy the disposable monthly income requirement in § 1129(a)(15); (5) the Plan fails to satisfy the absolute priority rule in § 1129(b) or the new value exception thereto; and (6) the discharge injunction provision in the Plan improperly proposes to preclude and enjoin TPT from seeking injunctive or other relief based on post-confirmation conduct of the Debtors. In addition, the Court has "an independent duty to assure that all requirements for confirmation are satisfied[.]" *In re Dynamic Brokers, Inc.*, 293 B.R. at 498; *see also Ambanc La Mesa Ltd. P'ship,* 115 F.3d at 653.

The Court finds that §§ 1129(a)(5), 1129(a)(6), 1129(a)(7)(B), 1129(a)(13), 1129(a)(14), and 1129(a)(16) do not apply in this case. (*See also* DE 378 at § IV). The Court will address each of the remaining provisions of § 1129 in turn.

### A. Section 1129(a)(1) – Plan Compliance with Code

Pursuant to § 1129(a)(1), the Court can only confirm a plan that complies with the applicable provisions of the Code. In its objection, TES argues that the Plan improperly classifies TPT's claim with the other general unsecured claims, in violation of § 1122(a). TES did not

---

[18] Unless otherwise indicated, references to statutory citations are references to the Bankruptcy Code, Title 11 of the United States Code.

preserve this argument in the Joint Pretrial Statement.

In any event, "[s]ection 1122(a) provides that for claims other than those classified together for administrative convenience, 'a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.'" *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 896–97 (B.A.P. 9th Cir. 1994) (quoting 11 U.S.C. § 1122(a)). In other words, "dissimilar claims cannot be placed into the same class." *In re Loop 76, LLC*, 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012), *aff'd*, 578 F. App'x 644 (9th Cir. 2014).

"The Code is silent on how to ascertain whether claims are 'substantially similar.'" *Id.* The Ninth Circuit has directed courts to "evaluate the nature of each claim, i.e., the kind, species, or character of each category of claims." *In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994), *as amended* (May 6, 1994). However, courts have recognized that "[g]enerally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case." *In re City of Stockton, California*, 542 B.R. 261, 280 (B.A.P. 9th Cir. 2015) (quoting *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 687 (Bankr. D. Colo. 1995)).

The Plan classifies all the general unsecured claims into one class, Class 8. TES argues that TPT's claim is not substantially similar to those of the other unsecured creditors in Class 8 in that TPT's claim is potentially nondischargeable, is unliquidated, and may be "enormous." However, there has been no dischargeability determination by this Court, and even if there had been such determination, "the nondischargeable nature of [debt] is alone an insufficient basis for separately classifying [such debt]." *In re Labib-Kiyarash*, 271 B.R. 189, 196 (B.A.P. 9th Cir. 2001) (citing *In re Sperna*, 173 B.R. 654, 658 (B.A.P. 9th Cir. 1994)). Further, the unliquidated status and amount of TPT's potential claim do not distinguish TPT's claim for purposes of § 1122(a). TES has failed to show that there is any material legal distinction between any of the Class 8 claims, nor are there any special circumstances that would otherwise require separate classification of the general unsecured claims in this case.

Based upon the foregoing, the Court finds that the Class 8 claims are substantially similar,

and therefore permissively classified together. With the exception of the remaining provisions of § 1129, which are addressed below, the Court finds that the Plan complies in all material ways with the applicable provisions of the Code, thus satisfying § 1129(a)(1).

**B.  Section 1129(a)(2) – Plan Proponents' Compliance with Code**

Pursuant to § 1129(a)(2), the Court can only confirm a plan if the proponents of the plan have complied with the applicable provisions of the Code.

In this case, Mrs. Crowe testified as to her understanding that she and Mr. Crowe have complied with all provisions of the Bankruptcy Code. (3/31/2021 Hearing Tr. 7:7-10). No party has argued to the contrary, and nothing in the record refutes Mrs. Crowe's testimony. The Court finds Mrs. Crowe's testimony on this issue to be credible and therefore finds that the Crowes have complied in all material respects with the applicable provisions of the Bankruptcy Code, thus satisfying § 1129(a)(2).

**C.  Section 1129(a)(3) – Requirement that Plan Be Proposed in Good Faith and Not by Any Means Forbidden by Law**

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." Under Ninth Circuit case law, the Court need only look to the circumstances surrounding the proposal of the plan for purposes of § 1129(a)(3), and need not look to the terms of the plan itself. *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019) (concluding that "§ 1129(a)(3) directs courts to look only to the proposal of a plan, not the terms of the plan"); *In re Juarez*, 836 Fed. App'x 557, 560 (9th Cir. 2020) ("The focus under § 1129(a)(3) is limited to 'the manner of the plan's *proposal*,' not on a debtor's allegedly bad faith activities unrelated to plan proposal, because § 1129(a)(3) does not require that a plan 'comply with all applicable law.'").

Mrs. Crowe testified that the Plan has been proposed in good faith, that the goal of the Plan is to repay creditors according to the terms set forth in the Plan, and that there are no adverse intentions or ulterior motives related to the proposal of the Plan. (3/31/2021 Hearing Tr. 7:11-18). Although TPT suggests that to the extent Mr. Crowe engages in illegal activity post-confirmation, the Plan cannot be said to have been proposed in good faith and not by any means

forbidden by law, such argument is premised upon future, speculative events. There is nothing in the record that indicates the Crowes did not propose their Plan in good faith or that the Crowes proposed their Plan by a means forbidden by law. Based upon the foregoing, the Court finds that § 1129(a)(3) is satisfied.

### D. Section 1129(a)(4) – Court Approval of Fees and Costs

All payments to be made under the Plan for services, costs, or expenses in connection with this case or the Plan have been or are subject to Court approval. The Court therefore finds that § 1129(a)(4) is satisfied.

### E. Section 1129(a)(7)(A) – Best Interests of Creditors Test

Section 1129(a)(7)(A) requires that each holder of a claim or interest in an impaired class either accept the plan or receive or retain under the plan at least as much as the holder of that claim would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A); *In re Bashas' Inc.*, 437 B.R. 874, 914 (Bankr. D. Ariz. 2010).

In order to determine whether a plan satisfies § 1129(a)(7)(A), courts must determine what creditors and interest holders would receive under a hypothetical liquidation, and compare that hypothetical liquidation return with what creditors and interest holders are slated to receive under the proposed plan. *In re Tenderloin Health*, 849 F.3d 1231, 1237 (9th Cir. 2017). "[A] hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997). Given the speculative nature of the § 1129(a)(7)(A) analysis, "[i]n computing the hypothetical chapter 7 liquidation, the court is entitled to view the entire record of the case and to engage in rational speculation about what would occur in a chapter 7 liquidation." *Id.* at 174.

It is the Debtors' position that general unsecured creditors would not receive anything in a chapter 7 liquidation and that their Plan, which proposes to pay general unsecured creditors an estimated $222,341.61, therefore satisfies § 1129(a)(7)(A). (*See* DE 395 at Ex. 2).

TES argues that the Crowes have failed to meet their burden of establishing by a

preponderance of the evidence that the Plan satisfies the best interests of creditors test.[19] Specifically, TES challenges the Debtors' zero-dollar valuation of CE-Systems' interest in EnerTech for purposes of the § 1129(a)(7)(A) analysis.[20] TES asserts that it would offer to buy the interest in CE-Systems from a chapter 7 trustee for between $50,000 and $200,000, which TES suggests is evidence of value, and supports its position that creditors would receive more in a chapter 7 liquidation than they would under the Plan.

As an initial note, the representation by TES that it would bid $50,000 to $200,000 to buy the Debtors' interest in CE-Systems was raised for the first time in TES's post-trial brief. No representative of TES testified during the confirmation hearing, and this representation is not otherwise supported by any evidence in the record. The Court therefore gives no weight to this assertion by TES.

With respect to the value of CE-Systems' 37% interest in EnerTech, Mr. Crowe testified that EnerTech, which develops technology and other products around turbines, has been funded by loans and has approximately $4.5 million of debt on its balance sheet. (3/30/2021 Hearing Tr. 27:2-5, 31:4-10). Mr. Crowe testified that as of the time of the contested confirmation hearing, if EnerTech's assets were to be compared against its liabilities, EnerTech would not be a solvent company. (3/30/2021 Hearing Tr. 31:11-13). Given that EnerTech's liabilities exceed its assets, Mr. Crowe testified as to his belief that EnerTech is insolvent and that CE-Systems' interest in EnerTech is therefore without value. (3/30/2021 Hearing Tr. 31:17-32:3; *see also* 3/30/2021 Hearing Tr. 84:9-16). No other evidence of value was provided to refute Mr. Crowe's testimony or to demonstrate that CE-Systems' 37% equity interest in EnerTech would have any monetary value in a chapter 7 liquidation.

Ultimately, no party opposing confirmation presented any affirmative evidence that the Debtors' liquidation analysis is flawed, and the Court therefore finds that the Debtors have met their burden of establishing by a preponderance of the evidence that the Plan satisfies

---

[19] TES did not clearly preserve a § 1129(a)(7)(A) argument in the Joint Pretrial Statement, although TES did preserve certain valuation arguments.

[20] As discussed above, CE-Systems' assets, apart from its ownership interest in EnerTech, are cash and provisional patents. There is no dispute as to the value of CE-Systems' cash or provisional patents for purposes of § 1129(a)(7)(A).

1  § 1129(a)(7)(A).

### F. Section 1129(a)(8) – Plan Acceptance

The parties agree that there is a class of impaired claims that has voted to reject the Plan, thus triggering the provisions of § 1129(b). (*See* 3/30/2021 Hearing Tr. 55:15-18).

### G. Section 1129(a)(9) – Administrative Claims

The parties agree that the Plan provides for the satisfaction of allowed administrative expenses in full or as otherwise agreed, and provides for the satisfaction of all unsecured priority claims as and when allowed. (DE 378 at § IV.D-E). The Court finds § 1129(a)(9) to be satisfied.

### H. Section 1129(a)(10) – Impaired Accepting Class

As noted above, the parties agree that there is at least one impaired accepting class. Section 1129(a)(10) is therefore satisfied.

### I. Section 1129(a)(11) – Feasibility

Section 1129(a)(11) requires that a plan be feasible in order to be confirmed. A plan is feasible if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "The Code does not require the [plan proponent] to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *Loop 76, LLC,* 465 B.R. at 544.

No feasibility objections remain outstanding. This is an individual case and the proposed funding sources for the Plan are Mr. Crowe's post-petition wages, net proceeds from liquidating certain assets, cash from the Debtors' bank accounts, cash from wholly-owned Debtor entities, a new value cash contribution, and potentially a second position mortgage on the Crowes' Residence. The monthly operating reports reflect that Mr. Crowe, who has been employed by EnerTech for nearly the entirety of this case, has generated steady monthly income sufficient to fund the Plan, and Mr. Crowe testified that, if needed, he would find alternative employment that would generate comparable income to fund the Plan. (3/30/2021 Hearing Tr. 30:2-31:3). There is nothing to indicate that the other funding sources for the Plan are unrealistic or in any way

visionary. The Court finds Mr. Crowe's testimony, which is buttressed by the monthly operating reports filed in this case, to be credible and to be sufficient to satisfy the burden of establishing that the Plan is feasible. Further, although Mrs. Crowe testified that she does not intend to work during the term of the Plan, Mrs. Crowe was employed and earning income for a period of time during the pendency of this case, and the record suggests that to the extent needed, she would be capable of obtaining employment to contribute income to make the necessary plan payments.

The Court finds that the Plan is feasible and satisfies § 1129(a)(11).

**J.   Section § 1129(a)(12) – Payment of U.S. Trustee Fees**

Mrs. Crowe testified that all fees due to the U.S. Trustee had been paid or would be paid, and this provision is not in dispute. (3/31/2021 Hearing Tr. 9:15-20; DE 378 at § IV.I). The Court finds § 1129(a)(12) to be satisfied.

**K.   Section 1129(a)(15) – Projected Disposable Income Requirement**

Pursuant to § 1129(a)(15):

> In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--
>
> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

At this juncture, Mr. Brew, who has filed a general unsecured claim in this case, which claim is deemed allowed given that no objection has been filed thereto, has objected to confirmation, triggering the applicability of § 1129(a)(15). Although Mr. Brew did not preserve a § 1129(a)(15) objection, he joined in the Committee's original plan objection, which contained a § 1129(a)(15) objection. The Committee mentions § 1129(a)(15) as an objection in its post-trial brief, but the Committee's arguments focus only on the new value exception to the absolute priority rule. Mr. Brew's objection to confirmation, however, remains outstanding.

Given that the Debtors' project that payments to the general unsecured class under the Plan would total approximately $222,341.61, the Plan is not a full payment plan.[21] Because the Plan does not propose to pay general unsecured claims in full, it does not satisfy § 1129(a)(15)(A), and must therefore satisfy § 1129(a)(15)(B).

The Debtors argue that § 1129(a)(15)(B) only requires that they pay under the Plan, in total to all creditors, an amount equal to or greater than their projected disposable income, while TES argues that § 1129(a)(15)(B) requires the Debtors to pay the full amount of their projected disposable income to unsecured creditors for 60 months.

There is Ninth Circuit dicta that suggests that § 1129(a)(15)(B) requires debtors to "dedicate at least five years' disposable income to the payment of unsecured creditors[.]" *Zachary v. California Bank & Tr.*, 811 F.3d 1191, 1199 (9th Cir. 2016) (quoting *Ice House Am., LLC v. Cardin*, 751 F.3d 734, 740 (6th Cir. 2014)). However, the United States Supreme Court has made clear that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Based upon this Court's plain reading of the statute, § 1129(a)(15)(B) requires only that the "value of the property" that is to be distributed "under the plan" be not less than the projected disposable income that is to be received by the debtors during the 5-year period beginning on the date plan payments begin, or during the term of the plan, whichever is longer.[22] In other words, a plain language reading of § 1129(a)(15)(B): (1) does not require that debtors contribute all of their projected disposable income to the plan, but rather requires that the total "value of the property" to be distributed be at least equal to the debtor's projected disposable income; and (2) requires that courts compare the debtor's projected disposable income to the value of all property that is to be distributed "under the plan," not just the value of the property to be

---

[21] *See supra* § II.B.

[22] The Court notes that post-*Zachary* Ninth Circuit and Ninth Circuit B.A.P. case law is ambiguous as to the proper interpretation of § 1129(a)(15). *See In re Juarez*, 603 B.R. 610, 627 (B.A.P. 9th Cir. 2019), *aff'd*, 836 F. App'x 557 (9th Cir. 2020) (providing that "if an allowed unsecured creditor objects to the plan, the debtor must commit all of his projected disposable income for at least five years"); *In re Juarez*, 836 F. App'x 557, 560 (9th Cir. 2020) (engaging in no discussion as to the requirements of § 1129(a)(15), and finding only that this Court had not erred in finding that certain transfers were not part of the debtor's disposable income).

distributed to general unsecured creditors.

Had Congress intended that § 1129(a)(15)(B) require debtors to contribute the value of their projected disposable income to the payment of unsecured creditors, Congress could have so provided. Section 1129(a)(15)(B) refers explicitly to and incorporates by reference a portion of § 1325(b)(2). Section 1325(b)(2)'s counterpart, § 1325(b)(1), specifically provides that in chapter 13 cases in which the provision applies, the plan must "provide[] that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). Section 1129(a)(15)(B), by contrast, requires only that "the value of the property to be distributed under the plan" be not less than the projected disposable income received by the debtor during the applicable time period. 11 U.S.C. § 1129(b)(2)(B) (emphasis added). Congress clearly knew how to require a debtor to commit his or her projected disposable monthly income to the payment of unsecured creditors, and Congress opted not to impose such requirement in individual chapter 11 cases.

Under the Court's reading of § 1129(a)(15)(B), there is still a "double whammy"[23] against individual chapter 11 debtors given that § 1129(a)(15) and the absolute priority rule are independent requirements that can both still be triggered in individual cases. When both provisions are triggered, to the extent the plan does not propose to satisfy the absolute priority rule, as is the case here, the debtor must still contribute to the plan value of not less than the debtor's projected disposable income over a 5-year period, and the debtor must contribute sufficient new value to the plan, which new value cannot come from the debtor's projected disposable income.

In this case, there is no dispute that the value of the property to be distributed under the Plan is approximately $701,005. (*See* DE 395 at § III). The Debtors assert that their projected disposable income over the five-year term of the Plan is approximately $221,422. (DE 395 at Ex. 1 & 2). TES has objected to the utilities and charitable contribution expenses set forth in the Debtors' projected disposable monthly income analysis, and argues that the Debtors have

---

[23] *Zachary*, 811 F.3d at 1199.

undercalculated their projected disposable income by approximately $616 per month, or $36,960 over the term of the Plan. The Court finds that the Debtors have provided credible financial information to support their projected disposable income calculation. (*See* 3/31/2021 Hearing Tr. 12:12-20:22). Even if the Court were to sustain TES's line-item objections, the distributions to be made under the Plan would nevertheless exceed the Debtors' projected disposable income by more than $440,000. Further, if for purposes of this analysis the Court were to deduct the proposed new value contribution from the value to be distributed under the Plan, the distributions to be made under the Plan would still exceed the Debtors' projected disposable income by more than $260,000. The Court therefore finds that § 1129(a)(15) is satisfied.

**L.    Section 1129(b) – Cramdown**

Pursuant to § 1129(b)(1), because there is an impaired class that has not accepted the Plan, the Court can only confirm the Plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the [P]lan."

The parties objecting to confirmation are general unsecured creditors who are treated in Class 8 of the Plan. In order to be "fair and equitable" with respect to a class of unsecured claims –

> (i)    the plan [must] provide[] that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii)   the holder of any claim or interest that is junior to the claims of such class [must] not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of [§ 1129].

11 U.S.C. § 1129(b)(2)(B).

Given that the Plan does not propose to pay all allowed general unsecured claims in full, the Plan can only be confirmed if it satisfies the absolute priority rule in § 1129(b)(2)(B)(ii) or the new value exception thereto.

The Debtors propose to fulfill the requirements of § 1129(b)(2)(B)(ii) by satisfying the new value exception to the absolute priority rule. Under the new value exception, individual debtors may retain property under a plan "if they offer 'value' . . . that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received." *Juarez*, 603 B.R. at 622 (quoting *In re Brotby*, 303 B.R. 177, 195 (B.A.P. 9th Cir. 2003)); *accord Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 654. "Recognizing that the new value corollary was initially developed with the corporate debtor in mind, bankruptcy courts have observed that its application in individual chapter 11 cases is difficult and have concluded that the exception should be narrowly construed." *In re Hamilton*, No. 3:14-BK-3142-C-11, 2018 WL 3637905, at *10 (B.A.P. 9th Cir. July 31, 2018), *aff'd*, 803 F. App'x 123 (9th Cir. 2020).

Pursuant to the Plan, the Debtors propose the following new value contributions:

> $100,000.00 of cash contributed by the Debtors raised from encumbering or liquidating otherwise exempt assets, all of which is new value from the Debtors, and will be made available to make Effective Date Payments; [and]
>
> . . . . If the Debtors are unable to secure a [junior] loan [secured by the Residence in the amount of $75,000.00], they will liquidate exempt assets to contribute such amount as additional new value[.]

(DE 395 at § III).

Consistent with the Plan, Mr. Crowe testified that he and his wife would provide between $100,000 and $175,000 of new value in exchange for retaining non-exempt assets. (3/30/2021 Hearing Tr. 55:25-56:6). Mr. Crowe testified that at least $100,000 would come from the liquidation of exempt assets, specifically exempt retirement funds, and that if he and his wife are unable to obtain a new loan against their Residence in the amount of $75,000 to contribute to Effective Date payments, they would liquidate additional exempt retirement funds to contribute an additional $75,000 of new value. (3/30/2021 Hearing Tr. 56:7-18, 146:4-25). The proposed junior loan, if obtained, is not attributable to new value.[24]

---

[24] The Committee has expressed some confusion and has raised certain objections pertaining to the source

### 1. The "New" Requirement

A contribution is "new" if the debtors would not otherwise be obligated to make the contribution. *See Hamilton*, 2018 WL 3637905, at *11.

In this case, the new value contribution is slated to come from the liquidation of exempt assets, specifically retirement accounts. Because the Crowes would not otherwise be obligated to liquidate their exempt retirement accounts for the benefit of creditors, the proposed new value contribution is "new."

### 2. The "Substantial" Requirement

"The Ninth Circuit has declined to specifically adopt a particular methodology for determining whether a contribution is substantial, holding instead that a 'de minimis contribution' does not satisfy the new value exception." *In re Dunlap Oil Co., Inc.*, No. BAP AZ-14-1172-JUKID, 2014 WL 6883069, at *21 (B.A.P. 9th Cir. Dec. 5, 2014) (citing *Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655). The Ninth Circuit has, however, recognized that when determining whether a new value contribution is "substantial," it may be relevant to: (1) compare the amount of the contribution to the total unsecured claims; (2) compare the amount of the contribution to the amount of claims being discharged; and (3) consider how much of the dividend being paid on unsecured claims would come from the contribution. *Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655; *see also Dunlap Oil Co., Inc.*, 2014 WL 6883069, at *21. Ultimately, the facts and circumstances of the case should inform the court's decision as to whether a proposed contribution is sufficient. *See, e.g., In re Snyder*, 967 F.2d 1126, 1131-32 (7th Cir. 1992) ("There is no mathematical formula for resolving the substantiality issue, and it will depend on the circumstances of the individual case."); *In re Green Pharm., Inc.*, 617 B.R. 131, 137 (Bankr. C.D. Cal. 2020) (expressly declining to ignore the specific circumstances of the case); *In re Eagan*, No. 12-30525, 2013 WL 237812, at *7 (Bankr. W.D.N.C. Jan. 22, 2013) (determining that "there can be no formulaic approach" and that "[t]he sufficiency of a new value

---

of the new value funds under the two alternative scenarios set forth in the Plan. Given Mr. Crowe's testimony, the Court understands that the proposed new value contribution would be funded solely from exempt retirement funds. Under the Plan's two alternative new value scenarios, what would change is not the source of the new value funds, but rather the amount of the proposed new value contribution.

contribution depends on the application of common sense to the circumstances presented in each unique case").

In this case, looking to the *Ambanc* framework: (1) the proposed new value contribution represents either approximately 44% or approximately 77% of the general unsecured claims in this case that are currently deemed allowed, depending on whether or not the Debtors are able to obtain a junior lien on their home; (2) the amount of dischargeable debt in this case has not yet been established, and could range anywhere from all or nearly all of the debt in this case to a minimal amount of the debt in this case;[25] and (3) it is possible that in excess of 74% of the proposed new value contribution would be used for the payment of general unsecured claims.[26] The Court further notes that the proposed new value contribution equals at least half of Mr. Crowe's gross annual salary.

Although the Committee suggests that the Court should compare the amount of the proposed new value contribution to the value of the non-exempt assets the Crowes would retain under the Plan, that analysis will be done in the context of evaluating whether the proposed new value contribution satisfies the "reasonably equivalent to the value or interest received" prong of the new value analysis.

Based upon the Court's consideration of the *Ambanc* factors and the totality of the circumstances of this individual chapter 11 case, the Court finds that the proposed new value contribution, as set forth in the Plan, is substantial.

### 3. "Money or Money's Worth" Requirement

In order to satisfy the "money or money's worth" requirement, the proposed new value contribution must: "(1) consist of money or property which is freely traded in the economy, and (2) must be a present contribution, taking place on the effective date of the Plan rather than a future contribution." *Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655.

Under the terms of the Plan, and as confirmed by Mr. Crowe during the contested

---

[25] TPT has filed a nondischargeability action against the Debtors, which action remains pending, and at issue in which action is anywhere from $0 to in excess of $30 million. *See Turbine Powered Technology, LLC v. Crowe et al*, 4:19-ap-00260-BMW (Bankr. D. Ariz. 2019).

[26] The Court bases this conclusion on an assumption that a minimum of $100,000 of new value would fund Effective Date payments to general unsecured creditors. (*See* DE 395).

confirmation hearing, the proposed new value contribution would be made on or before the Effective Date. (3/30/2021 Hearing Tr. 56:19-24). Mr. Crowe further testified that the proposed new value contribution would be a cash contribution. (3/30/2021 Hearing Tr. 57:25-58:2). Accordingly, the proposed new value contribution is "an up-front infusion of money . . . ." *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 78 (B.A.P. 9th Cir. 1994). Contrary to the Committee's assertion that not all of the proposed new value contribution is "money or money's worth" based on the Committee's understanding that some of the new value contribution would be derived from the Debtors' disposable monthly income, as discussed above, the proposed new value contribution, under either scenario set forth in the Plan, would be derived exclusively from the liquidation of exempt retirement funds.

Based upon the foregoing, the Court finds that the proposed new value contribution satisfies the money or money's worth requirement.

### 4. "Necessary for a Successful Reorganization" Requirement

The Debtors assert that their proposed new value contribution is necessary for their successful reorganization. The Committee concedes that certain of the non-exempt assets the Debtors seek to retain are necessary for the Debtors' successful reorganization, but the Committee argues that the Debtors' proposed retention of their interests in Arizona Turbine, Vida, CE-Systems, as well as other assets that the Committee acknowledges have relatively minimal value, are not necessary for the Debtors' successful reorganization.

The Court does not find the Committee's objection to be persuasive. As an initial note, the Committee has failed to establish that any of the assets it argues are unnecessary to the Debtors' reorganization have anything more than nominal value. The Debtors have proposed to liquidate certain assets to fund their Plan, and the Committee would have the Court require the Debtors to liquidate additional assets for the sake of liquidation. The purpose of chapter 11 is to allow debtors to reorganize and to avoid further liquidation. *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n.2 (2008) (recognizing that "the central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations").

Given that not all classes have voted to accept the Plan, the Debtors cannot confirm their

Plan and embark upon a reorganization unless they can satisfy the absolute priority rule or new value exception. Further, the proposed new value contribution is necessary in order for the Debtors to make their Effective Date payments to priority and general unsecured creditors. Based upon the totality of the circumstances, the Court finds that the proposed new value contribution is necessary for these individual Debtors to successfully reorganize.

### 5. "Reasonably Equivalent to the Value or Interest Received" Requirement

Generally speaking, in determining whether the amount of the proposed new value contribution is reasonably equivalent to the value or interest to be received by the Debtors, the Court must compare the amount of the proposed contribution against the value and interests of the non-exempt assets, excluding those assets that are included in the estate pursuant to § 1115, that the Crowes propose to retain under the Plan. *See Juarez*, 836 F. App'x at 561-62.

The Debtors are proposing to retain their Residence; certain tangible personal property; cash; retirement accounts; and ownership interests in Vida, CE-Systems, and Arizona Turbine. The Debtors' calculate that they would retain non-exempt assets worth approximately $175,557.83 under the Plan. (DE 395 at § III). The Debtors argue that their proposed new value contribution, under either the $100,000 or $175,000 scenario set forth in the Plan, is reasonably equivalent to the value they would retain under the Plan given the nature of the non-exempt equity they are seeking to retain, most of which is attributable to their Residence, and given the total amount of the proposed plan payments.

TES argues that the proposed new value contribution is at least $100,557 less than the value of the non-exempt equity the Debtors would retain under the Plan based on the Debtors' own valuations of their non-exempt assets, such that the proposed new value contribution is not reasonably equivalent to the value of the interests the Crowes would receive under the Plan. (DE 417). TES appears to argue that a new value contribution has to equal the value of retained non-exempt equity. The Committee likewise argues that the proposed new value contribution is not reasonably equivalent to the non-exempt property sought to be retained, which property the Committee alleges is worth at least $240,557.83. (DE 416 at 11 & App'x A).

The parties agree that the Residence, in which the estate has an interest, has appreciated

during the pendency of this case. The parties disagree as to whether the post-petition appreciation in the Residence is to be considered for purposes of § 1129(b)(2)(B)(ii), and by association, the new value analysis. The parties further disagree as to what amounts should be deducted from the value of the Residence for purposes of valuing the non-exempt equity in the Residence that the Debtors are proposing to retain. There are also disputes as to whether the Debtors' proposed retention of $25,000 of cash should be considered for purposes of the new value analysis, and as to what the retained value of CE-Systems would be.

Section 541 generally defines what constitutes property of the estate in a given case. Under § 541, the estate is created upon the commencement of the case, but under certain provisions of § 541, the estate can acquire additional property post-petition. *See* 11 U.S.C. § 541(a)(6)-(7); *In re Markosian*, 506 B.R. 273, 275 (B.A.P. 9th Cir. 2014). Further, in individual chapter 11 cases, § 1115 "adds to the § 541 'property of the estate' certain [additional] property obtained by the debtor 'after the commencement of the case[.]'" *Zachary,* 811 F.3d at 1195.

Relevant to the issue before the Court, § 541(a)(6) brings into the estate, among other things, "[p]roceeds, product, offspring, rents, or profits of or from property of the estate . . ." and § 1115(a) brings into the estate "all property of the kind specified in section 541 that the debtor acquires after the commencement of the case . . ." as well as "earnings from services performed by the debtor after the commencement of the case . . . ." Property can be removed from the estate pursuant to, for example, the applicable exemption statutes.

Generally speaking, what is subject to the absolute priority rule is property of the estate that debtors propose to retain under their plan. *See Zachary*, 881 F.3d at 1195-98.[27] However, because the Debtors in this case are individuals, "property [of the estate] included under section 1115" is not considered for purposes of the new value analysis. 11 U.S.C. § 1129(b)(2)(B)(ii); *see also Zachary,* 881 F.3d at 1196; *Juarez*, 603 B.R. at 622. That being said, the Ninth Circuit has narrowly construed the § 1115 exception to the absolute priority rule. *Zachary v. California Bank & Tr.,* 881 F.3d 1191, 1196 (9th Cir. 2016). Assets that are property of the estate pursuant

---

[27] Thus, exempt assets are not included in the § 1129(b)(2)(B)(ii) analysis, *Juarez*, 836 F. App'x at 561, and no party has argued to the contrary.

to § 541 remain subject to the absolute priority rule. *Zachary*, 811 F.3d at 1197-98 (quoting and agreeing with *Ice House*, 751 F.3d at 738-39, in which the Sixth Circuit explained that § 1129(b)(2)(B)(ii) provides that "the debtor may retain property that § 1115 takes into the estate," and reading §§ 1115 and 1129(b)(2)(B)(ii) as "defining a new class of property that is exempt from the absolute priority rule").

### a.   Retention Value of Residence

No party disputes that the Residence became property of the estate upon the bankruptcy filing pursuant to § 541. The Debtors scheduled their Residence as having a value of $450,000 as of the Petition Date, and the parties agree that the value of the Residence as of the confirmation hearing was $525,000. (DE 83 at 1; DE 378 at § II.B).

Under Ninth Circuit case law, post-petition appreciation in estate property is property of the estate pursuant to § 541(a)(6), not § 1115. *Wilson v. Rigby*, 909 F.3d 306, 309 (9th Cir. 2018) (recognizing that, pursuant to § 541(a)(1), "'all legal or equitable interests of the debtor in property' transfer to the bankruptcy estate 'as of the commencement of the case[,]'" and "following this transfer, all '[p]roceeds, product, offspring, rents, or profits' enure to the bankruptcy estate" pursuant to § 541(a)(6), which "includes the appreciation in value of a debtor's home"); *In re Viet Vu*, 245 B.R. 644, 647-48 (B.A.P. 9th Cir. 2000) (compiling Ninth Circuit cases and concluding that "under § 541(a)(6), postpetition appreciation is property of the estate without regard to whether there is equity in the property as of the petition date").

Given the foregoing, the Court finds that the post-petition appreciation in the value of the Residence is property of the estate pursuant to § 541(a)(6), and therefore must be taken into account for purposes of the § 1129(b)(2)(B)(ii) analysis.

### b.   Retention of Cash

The Debtors propose to retain $25,000 in cash and cash equivalents, and argue that such cash represents post-petition earnings included in the estate pursuant to § 1115, which are excluded from the new value analysis pursuant to § 1129(b)(2)(B)(ii). The Committee and TES disagree.

The Debtors had approximately $64,200 in their checking and savings accounts as of the

Petition Date. (DE 83 at 4-5).[28] The most recent monthly operating report reflects that the Debtors now have approximately $153,000 in their checking and savings accounts. (DE 429). Substantially all of the income that has been generated during the pendency of this case is attributable to Mr. Crowe's salary and income derived from Mr. Crowe's consulting services. Accordingly, the $25,000 in cash the Debtors propose to retain under the Plan can reasonably be attributed to post-petition earnings, and is therefore excluded from the absolute priority analysis.

### c. Retention Value of CE-Systems

The Debtors propose to retain the 100% interest in CE-Systems, the retention of which asset they value at $5,000. (DE 395 § III). As discussed above, the assets of CE-Systems are cash, provisional patents, and a 37% ownership interest in EnerTech. TES and the Committee disagree with the Debtors' valuation of the 100% interest in CE-Systems.

TES argues that the Debtors have failed to establish by a preponderance of the evidence that CE-Systems' 37% interest in EnerTech is worth zero dollars. TES contends that CE-Systems' 37% interest in EnerTech has some value because: (1) pre-petition, the Debtors contributed technology to EnerTech in exchange for what was initially CE-Systems' 40% interest in EnerTech; (2) Mr. Harter or his entity brought approximately $3 million of capital to EnerTech in the form of debt in exchange for a 40% interest in EnerTech; (3) during the pendency of this case, CE-Systems gave up 3% of its interest in EnerTech to Mr. Harter as part of a $210,000 capital raise (the "Harter Transfer"), and would have gotten 1.5% of its interest back if it had consummated a transaction at a $10 million valuation in May 2020, which TES acknowledges did not occur; and (4) Mr. Crowe testified as to the bullish prospects of EnerTech in the next 18 to 24 months. (DE 417 at 2, 6-9).

The Committee argues that the Debtors improperly dissipated CE-Systems' cash and diluted the value of CE-Systems during the pendency of this case. Among other things, the Committee takes issue with payments made by CE-Systems that benefitted EnerTech, seemingly on the basis that those expenditures were not incurred because of CE-Systems' ownership interest

---

[28] The Debtors also scheduled brokerage accounts, but under the Plan, they are proposing to liquidate those accounts and contribute the net proceeds to the Plan. (DE 395 at § III).

in EnerTech, but rather were expenses that were paid in order for Mr. Crowe to keep his job as an employee of EnerTech. The Committee, like its member TES, also argues that CE-Systems' interest in EnerTech is undervalued given the Harter Transfer. Ultimately, the Committee asks the Court to find that CE-Systems is worth $197,447.36 more than the value ascribed to CE-Systems by the Crowes for purposes of the new value analysis. To reach this conclusion, the Committee added the funds that the Crowes allegedly improperly dissipated from CE-Systems, added $126,000 to that amount representing the Committee's value of the Harter Transfer, then subtracted from that total the $33,660 liquidation value attributed by the Crowes to CE-Systems. (DE 416 at 7).

To determine the retention value of the 100% ownership interest in CE-Systems, the Court will address the value of each of the assets of CE-Systems from an equity perspective.

### i. Provisional Patents

The Debtors have ascribed a zero-dollar value to CE-Systems' provisional patents, no party has challenged this valuation, and there is nothing in the record to suggest that these provisional patents have any equity value.

### ii. CE-Systems' 37% Interest in EnerTech

The Debtors have ascribed no value to CE-Systems' 37% ownership interest in EnerTech. As discussed above, Mr. Crowe testified that he ascribed no value to CE-Systems' ownership interest in EnerTech because EnerTech's liabilities exceed its assets, and he does not believe that the equity interest in EnerTech has any value. (3/30/2021 Hearing Tr. 31:17-32:3; *see also* 3/30/2021 Hearing Tr. 84:9-16). Mr. Crowe further testified as to his belief that the technology CE-Systems transferred to EnerTech in exchange for its original 40% ownership interest in EnerTech had no monetary value. (3/30/2021 Hearing Tr. 66:21-67:9). With respect to the alleged value of Mr. Harter's comparable initial interest in EnerTech, Mr. Crowe testified that Mr. Harter had contributed only a debt raise, in the form of loans by affiliated entities of Mr. Harter to EnerTech, in exchange for his initial 40% interest in EnerTech. (3/30/2021 Hearing Tr. 67:10-68:22). With respect to the Harter Transfer, Mr. Crowe testified as to his understanding that although the Harter Transfer reduced CE-Systems' ownership interest in EnerTech and

increased Mr. Harter's ownership interest in EnerTech, the Harter Transfer did not involve a transfer of monetary value because the consideration running from Mr. Harter to CE-Systems that resulted in the Harter Transfer was only additional debt financing. (*See* 3/30/2021 Hearing Tr. 70:11-73:5, 128:4-130:8). Additionally, there was no evidence presented that any of the debt financing by the Harter entities has been repaid, thus precluding any distribution to equity holders. Ultimately, no other testimony or persuasive evidence has been presented to the Court to rebut Mr. Crowe's valuation of CE-Systems' 37% interest in EnerTech, and the objecting parties' theories as to the Debtors' alleged undervaluation of the 37% interest in EnerTech rely upon a significant degree of speculation, which the Court does not find persuasive.

### iii. Cash

Based upon the foregoing, the only asset of CE-Systems that any party has established has monetary retention value is CE-Systems' cash. As of February 28, 2021, the balance sheet for CE-Systems reflects that CE-Systems had cash on hand in the amount of $52,843.64, and reflects no liabilities. (DE 367 at 5). There is no dispute that CE-Systems has less cash on hand now than it did on the Petition Date. However, Mr. Crowe testified that the decrease in CE-Systems' cash is attributable to business expenses incurred and paid by CE-Systems during the pendency of this case. (*See* 3/30/2021 Hearing Tr. 125:4-127:19). The Committee has accused the Debtors of improperly diminishing CE-Systems' bank account during the pendency of this case, but the Committee has presented no evidence to support such argument. The Committee failed to establish that any specific expenses paid by CE-Systems were improper, even if such expenses also benefitted EnerTech.

Given that the Debtors have proposed to contribute $45,000 in cash from CE-Systems to the Plan, the value of cash to be retained by CE-Systems does not exceed $7,800.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

### iv. Comparison of Proposed New Value Contribution Against Retention Value of Applicable Non-Exempt Assets Debtors Would Retain Under Plan

Taking into account the valuation-related findings made above, the Debtors are proposing to retain the following non-exempt equity under the Plan.

| | Valuation | Liens[31] | Exemption[32] | Non-Exempt Equity[33] |
|---|---|---|---|---|
| Residence | $525,000[34] | $140,167.76[35] | $150,000[36] | $234,832.24[37] |
| Cash | $25,000 | None | None | $0[38] |
| 2016 Toyota Tacoma | $18,000[39] | $22,945.95[40] | None | $0 |
| 2012 MKZ-Hybrid | $3,205[41] | None | $6,000 | $0 |
| 2008 Toyota Tacoma | $4,000[42] | None | $6,000 | $0 |
| Hyster | $7,200[43] | $1,575[44] | None | $6,425 |
| Boat | $500[45] | None | None | $500 |
| Household Furnishings | $3,000[46] | None | $11,000 | $0 |
| Household Electronics | 1,000[47] | None | $1,000 | $0 |
| Clothing | $500[48] | None | $1,000 | $0 |
| Jewelry | $400[49] | None | $4,000 | $0 |
| Animals | Unknown | None | $1,000 | $0 |
| Tools | $20,000[50] | $20,000[51] | $12,000 | $0 |
| Retirement Accounts | Balance in accounts after deduction of new value contribution | None | All funds in accounts | $0 |
| 100% Interest in CE-Systems | $7,800[52] | None | None | $7,800 |
| 100% Interest in Vida | $4,154[53] | None | None | $4,154 |
| 100% Interest in Arizona Turbine | $0.00[54] | None | None | $0 |
| **Total** | | | | **$253,711.24** |

[31] The Court will not deduct any hypothetical costs of sale or hypothetical future encumbrances given that the focus of the absolute priority rule and new value analysis is the value of the non-exempt equity that the Debtors propose to retain.

[32] Exemption claims and amounts are derived from the Debtors' amended Schedule C. (DE 25 at 10-11).

[33] These calculations are for purposes of the § 1129(b)(2)(B)(ii) analysis only.

[34] *See supra* § IV.L.5.a.

[35] This is derived from the lienholder's proof of claim. (Proof of Claim 4-1). This amount does not take into account any post-petition mortgage payments that have been made.

[36] The Court notes that although "exemptions must be determined in accordance with the state law 'applicable as of the date of filing[,]'" *In re Jacobson*, 676 F.3d 1193, 1199 (9th Cir. 2012) (quoting 11 U.S.C. § 522(b)(3)(A)), the applicable Arizona exemption statute has been amended post-petition to increase the homestead exemption amount by 40%, to $250,000, presumably to reflect the current economic environment. *See* H.B. 2617, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (effective Dec. 31, 2021).

[37] The Court notes that post-petition, the local housing market has experienced an economic surge. *See* Gabriela Rico, *Tucson's Housing Market is the Best the City Has Seen in 13 Years*, ARIZONA DAILY STAR Mar. 20, 2021, https://tucson.com/business/tucsons-2020-housing-market-is-the-best-the-city-has-seen-in-13-years/article_3b1d2176-83c2-5322-952c-e78bea7bb518.html. There is no guarantee that this equity valuation will maintain through the term of the Plan. Given this Court's experience with the residential real estate market in Arizona, it is unlikely that this housing bubble will be sustained over time.

[38] *See supra* § IV.L.5.b.

[39] This is the value of the vehicle as stipulated by the Debtors and the lienholder. (DE 159).

[40] This is the approximate amount of the lien, as stipulated by the Debtor and the lienholder. (DE 159).

[41] This is the scheduled value of the asset, and the value used by the Debtors in the retained assets analysis set forth in the Plan. (DE 83; DE 395 at § III). No party has challenged the Debtors' valuation of this asset and no evidence was presented to suggest that the Debtors' valuation is inaccurate.

[42] *Id.*

[43] This is the gross retention value ascribed to this asset by the Debtors in the Plan. (*See* DE 395 at § III). No party has challenged the Debtors' valuation of the Hyster and no evidence was presented to suggest that the Debtors' valuation is inaccurate.

[44] This is the scheduled lien amount. (DE 1 at 29).

[45] This is the scheduled value of this asset and the value used by the Debtors in the retained assets analysis in the Plan. (DE 83; DE 395 at § III). No party has challenged the Debtors' valuation of this asset and no evidence was presented to suggest that the Debtors' valuation is inaccurate.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] This is the scheduled value of this asset. (DE 83). No party has challenged the Debtors' valuation of this asset and no evidence was presented to suggest that the Debtors' valuation in inaccurate.

[51] This is the scheduled lien amount. (DE 1 at 30).

[52] *See supra* § IV.L.5.c.iii.

[53] This number is based on the estimated cash that will remain in Vida's account after the funding of the Plan and payment of estimated liabilities. *See also* § II.A.1.

[54] Both the Committee and the Debtors have valued the 100% interest in Arizona Turbine at $0 for purposes of this analysis. (DE 395; DE 416 at Ex. A).

Ultimately, the Debtors are proposing to contribute between $100,000 and $175,000 in new value to retain the non-exempt equity in their Residence, a vehicle and boat that are of minimal value to the estate, and interests in CE-Systems and Vida, the value of which, after the proposed contributions to the Plan, are negligible based upon the record before the Court. Notably, more than 90% of the non-exempt equity that the Debtors are proposing to retain is in their Residence, which is subject to at least one encumbrance as well as the Debtors' homestead exemption, and the valuation of which is informed by the bullish housing market that materialized post-petition. The Court finds that, based upon the totality of the circumstances in this case, the alternative new value contributions set forth in the Debtors' Plan are reasonably equivalent to the non-exempt equity value to be retained by the Debtors under the Plan.

Based upon the foregoing, the Court finds that the Plan satisfies the new value exception to the absolute priority rule, and thus satisfies § 1129(b)(2)(B)(ii).

**M.  Discharge Injunction**

The discharge injunction provision in the Plan provides in relevant part:

> Except as otherwise provided in the [Plan] or the Confirmation Order, the Confirmation Order acts as a discharge, effective as of the Effective Date, of any and all debts of the Debtors that arose at any time before the entry of the Confirmation Order, including, but not limited to, all principal and any and all interest accrued thereon, pursuant to Bankruptcy Code §§ 524 and 1141(d)(1).[55] The discharge of the Debtors shall be effective as to each claim, regardless of whether a proof of claim thereof was filed, whether the claim is an Allowed Claim or whether the holder thereof votes to accept the Amended Plan. Except as otherwise provided herein, upon the Effective Date, all such holders of claims and equity interests and their affiliates will be forever precluded and enjoined, pursuant to Bankruptcy Code §§ 105, 524, and 1141, from prosecuting or asserting any such discharged claim against the Debtors or the Reorganized Debtors, or against any of their assets or properties, any other or further claim or equity interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective

---

[55] The Plan further provides that pursuant to § 1141(d)(5), "Debtors will not be discharged from any debts unless and until: (i) Debtors complete all payments under the Amended Plan and obtain an order of the Bankruptcy Court granting a discharge (ii) the Bankruptcy Court grants a limited ('hardship') discharge as allowed under Bankruptcy Code § 1141(d)(5)(B); or (ii) the Bankruptcy Court orders otherwise for cause." (DE 129 at § V.B). The Plan also provides that "non-dischargeable debts under Bankruptcy Code § 523 will not be discharged." (DE 129 at § V.B).

Date, whether or not such holder has filed a proof of claim or proof of equity interest.

(the "Discharge Injunction Provision") (DE 129 at § V.A).

TPT objects to the scope and terms of the Discharge Injunction Provision. Specifically, TPT objects to the Discharge Injunction Provision to the extent it precludes or enjoins TPT from seeking injunctive or other relief against the Crowes for post-confirmation conduct in a court of competent jurisdiction. However, the Discharge Injunction Provision provides only that "holders of claims . . . and their affiliates will be forever precluded and enjoined, pursuant to Bankruptcy Code §§ 105, 524, and 1141, from prosecuting or asserting any such discharged claim against the Debtors or the Reorganized Debtors, or against any of their assets or properties, any other or future claim . . . based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date . . . ." (DE 129 at § V.A). This is consistent with § 1141, which TPT acknowledges enjoins and binds creditors with respect to pre-confirmation claims. *See Holywell Corp. v. Smith*, 503 U.S. 47, 58 (1992) (finding that § 1141(a) cannot bind a creditor with respect to a post-confirmation claim).

The issues of whether a hypothetical cause of action would be based upon pre- or post-confirmation conduct, and in what court TPT would be able to seek relief on account of a post-confirmation claim are not ripe for this Court's consideration, and will not be considered as part of this ruling and order on confirmation.

**V.  Conclusion**

For the reasons stated above and based upon the totality of the evidence presented in this case, the Court finds and concludes that the Debtors have met their burden of establishing that the Plan satisfies the provisions of §§ 1129(a) and (b) of the Code.

Wherefore, based upon the foregoing and for good cause shown;

**IT IS HEREBY ORDERED** that the objections to the Plan filed by the Committee, TPT, TES and Mr. Brew are overruled in their entirety.

**IT IS FURTHER ORDERED** confirming the Plan.

**DATED AND SIGNED ABOVE.**